IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ROBERT L. ROSE, | Cause No. CV 13-156-M-DWM-JCL |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| LEROY KIRKEGARD; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

This case comes before the Court on Petitioner Robert Rose's application for writ of habeas corpus under 28 U.S.C. § 2254. Rose is a state prisoner proceeding pro se. On October 15, 2013, Respondents ("the State") filed an Answer. Rose filed a reply on December 10, 2013.

The state court record in this matter is voluminous. Even so, on June 5, 2014, the State was ordered to file additional materials from the state record. It complied on June 27, 2014.

## I. Background

On January 10, 2002, Rose and a friend of his, Kirk Davies, traveled in Davies' truck from Kalispell to Stevensville. At the intersection of the Eastside Highway and Bell Crossing, both abandoned the truck in the road. A few people

1

stopped, thinking that someone needed help. At least three different people called 911. Both Rose and Davies had been cut and were bleeding. Both were eventually transported to the local hospital.

When Rose arrived at the hospital, he told a nurse that he "did a line of methamphetamine" the previous day, on January 9. A urine test was presumptively positive for methamphetamine. Blood was drawn, but it was consumed in medical tests before it could be analyzed for intoxicating substances. Rose's mother told medical personnel her son might be suicidal and was high on methamphetamine. Based on this information, the doctor who examined Rose noted that he had an "altered mental status secondary to drug use," either methamphetamine or amphetamine, but he also called for ruling out of mental illness. The doctor noted that the knife wound for which Rose was being treated could have been self-inflicted. At the time Rose was discharged, the wound was described as superficial.

Based on Davies' account of events, Rose was arrested at the hospital on the morning of January 11. He resisted arrest, at one point attempting to run away in his socks and underwear, "yelling" for his mother. He was apprehended by three officers and transported to the jail. While he was in the back seat of the police car, he found a can of pepper spray that had been left there. He concealed it in his underwear. During the booking process, Rose told Officer Andy Kollmer that "his

2

girlfriend had given him a row of drugs that he inhaled, but he didn't know what kind of drugs he was on." 3 Trial Tr. at 667:11-16. Shortly after that, Kollmer saw Rose heading toward the back of the booking cell, toward a shower area. As he appeared to be pulling an object out of his boxers, Kollmer moved in to investigate. Rose turned to Kollmer and sprayed the can of pepper spray in his face from ten or 12 feet away. Other officers came to assist. Kollmer testified that Rose twice put down and twice retrieved the can, loosing more pepper spray into the cell. He was eventually subdued. Three days later, Rose apologized to Kollmer.

Davies reported to police that Rose had forced him to drive from Kalispell to Stevensville by holding a knife on him. Based on that incident, Rose was charged with aggravated kidnapping and assault with a weapon. Based on his use of pepper spray in the jail, Rose was also charged with assault on a peace officer.

After two changes of counsel, a psychological evaluation, and an investigation and hearing regarding Rose's complaint about his last attorney, Kelli Sather, trial commenced on June 2, 2003. On the morning of the second day of testimony, Rose elected to represent himself. Sather attended the remainder of trial as stand-by counsel.

At trial, Davies testified that he and Rose were good friends. They were working together at a log-home construction site in Kalispell. On the morning

3

before their arrival in Stevensville, Rose, visibly "strung out" and peering suspiciously at other people at the site, told Davies he thought his girlfriend had slipped methamphetamine in his hot chocolate. Davies observed Rose behaving strangely. At one point, for instance, Rose hid his billfold under a rock. Concerned about his friend, Davies convinced Rose to come with him to a restaurant, hoping a meal might counter the effects of whatever Rose might have ingested.

On the way, Davies saw a billboard for Pathways, a drug treatment center. Davies asked Rose if he was willing to go there, and Rose said he was. Rose answered the admitting staffer's questions but could not check in; the treatment center was a for-profit facility, and Rose had no funds or insurance. He and Davies left. Rose phoned his mother. She told him he could come to Bell Crossing, between Stevensville and Hamilton, where she and Rose's father lived.

Davies and Rose began driving south from Kalispell. Rose, who had been criticizing Davies' driving, retrieved a tool belt from the back of the extended-cab pickup. He pulled out a utility knife/box cutter, reached over to lock Davies' door, then told Davies, "Now you'll learn to drive." Rose told Davies people were following him, signaling to each other when they passed the truck. He instructed Davies to run red lights to "lose" followers, to make U-turns in the narrow places where snow plows turn around, and to drive both east and west of Missoula,

avoiding the turnoff down Highway 93 to the Bitterroot valley to throw off phantom pursuers. As Rose and Davies headed west on the interstate out of Missoula, Davies worried Rose would want to go to Davies' home, where his children were.

Rose eventually directed Davies to Highway 93 south. When Davies slowed down and signaled to turn off of Highway 93 in the direction of Bell Crossing, Rose directed him to continue south to Darby.

Returning from Darby, Rose began to tell Davies he was sad he had not seen his daughter in a long time. He said to Davies, "Too bad about your kids." Rose then let Davies make the turn toward Bell Crossing but told him not to turn into his parents' driveway.

At the intersection of Bell Crossing and the Eastside Highway, Davies distracted Rose by pointing at something in the field beside the road. Then he slammed on the brakes and jumped on Rose to attempt to disarm him.

Rose cut Davies deeply in the back of his neck and stabbed him in the chest. Rose also hit Davies in the face with a nail-puller or cat's-paw. Davies, the bigger of the two, nonetheless forced Rose onto the top of the front seats in the extended-cab pickup. Rose, beaten, told Davies he would stop and started to climb into the back of the cab. Davies punched Rose twice in the back of the head. Rose fell into

the back of the cab and dropped the knife. Davies picked up the knife, threw it in a corner of the cab, scrambled out of the truck, and tried to run away in the dark. Disoriented and finding himself unable to run as he wanted to, Davies headed instead for a nearby house. He banged hard on the door but then saw Rose being let into the house by another door. Davies hastened back to the truck, where he encountered two brothers, Mark and Bryan Dalbey, driving on the road.

John Beck, a construction supervisor, also came across the three men on the road. Beck saw that Davies, who was wearing a down vest that had been cut open in several places, was covered in blood and down. As Beck had a first aid kit in his truck, he applied gauze to Davies' cheek, chin, and the back of his neck. Davies told Beck he had been kidnapped and stabbed. When paramedics arrived and cut open Davies' shirt, they found he had been stabbed in the chest as well. A doctor testified that, had the foot-long cut on Davies' neck started a half-inch closer to the front of the neck, "it could have gotten that carotid artery and nobody could have done anything." 2 Trial Tr. at 387:4-388:2 (stating cut was "about 32 centimeters around the back side of the neck").

The counselor at Pathways testified that Rose told him he had taken a small amount of methamphetamine the previous night and "wanted treatment because he was paranoid and delusional from his usage." 1 Trial Tr. at 261:13-20. Rose did

not appear to the counselor to be paranoid and delusional.

No testing was done to determine whose blood was where in the truck, and no fingerprints were taken. On January 16, 2002, about a week after the incident, Rose was taken back to the hospital for a blood test to determine whether traces of methamphetamine were still present. At that time, Rose told the transporting officer "there was something in his system that caused his problems on January the 10th." 1 Trial Tr. at 321:10-20. It is not clear whether Rose made this statement before or after the results of the test were known, but the result was negative.

Rose's brother told an officer that his parents had told him Robert was "strung out on crank" and had slit his own throat. 2 Trial Tr. at 461:19-462:3. When Rose asked Officer Fowler, at trial, about the officer's request for a statement on the night Rose arrived at the hospital, Fowler responded to Rose, "your words were that you needed to wait until you came down off the drugs to make a statement, and that you would do it the next day." *Id.* at 463:18-464:3. Rose did not make a statement the next day.

Rose's mother testified to the content of the phone calls Rose made to her on January 10. Among other things, she said she and Rose were talking about getting him into treatment in Spokane. She did not recall telling a doctor that Rose had taken methamphetamine and stated that she would not have known that. Rose's

father testified at trial that Rose told him he was not using drugs and repeatedly asked his father rhetorically, "Why would he," meaning Davies, "cut me?" When Rose's father was interviewed by police a few months after the incident, he did not mention these statements by Rose.

Rose also testified. He said he did not know what was happening while he and Davies were driving, while he was at the hospital, or for the first period of time he was at the jail. He asserted, in effect, that he was not capable of acting knowingly or purposely. He also asserted that he defended himself against Davies, who, from Rose's perspective, suddenly attacked him.

After a four-day trial, the jury deliberated for about five hours. Rose was convicted on all three counts on June 6, 2003.

After trial, Rose moved to disqualify Judge Langton, sought a new trial, and requested an "updated" psychological evaluation. After lengthy proceedings, all motions were denied.

Over a year later, on August 10, 2004, a sentencing hearing was held. Rose was designated a persistent felony offender and sentenced to serve 50 years for aggravated kidnapping with 20 years suspended; 20 years for assault with a weapon; ten years for assault on a peace officer; and an additional 20 years as a persistent felony offender. All charges were to run consecutively. The total term

was 100 years in prison with 20 years suspended.

Rose appealed, alleging that he was deprived of a speedy trial; that the trial court should have held a hearing on Rose's pre-trial complaints that Sather was ineffective; that Sather was ineffective in voir dire because she did not attempt to remove a prospective juror for cause and ineffective at trial because she did not object to the admission of evidence that Rose was a methamphetamine user before the night in question; and that the prosecution's closing argument deprived him of a fair trial. The Montana Supreme Court remanded the case for an evidentiary hearing on Rose's claim of prejudice from an alleged speedy trial violation and for entry of findings and conclusions by the trial court sufficient to support appellate review. After the hearing and supplemental briefing, on January 13, 2009, the Montana Supreme Court rejected all of Rose's allegations of error and affirmed his convictions. *See generally State v. Rose*, 202 P.3d 749 (Mont. 2009) ("*Rose I*"). Rehearing was denied on March 11, 2009. Order (Doc. 8-75) at 1. The United States Supreme Court denied a writ of *certiorari* on October 5, 2009. Clerk Letter (Doc. 8-76) at 1.

On September 30, 2010, Rose filed a petition for postconviction relief in the trial court. It was denied on January 18, 2012. Order (Doc. 8-79) at 1-91. Rose appealed. He claimed that Sather was ineffective in plea negotiations; that he was

unlawfully deprived of his right to consult with counsel in the overnight recess between the first two days of trial; and that appellate counsel was ineffective because he failed to raise an issue on direct appeal regarding Rose's access to counsel in the overnight recess between the first two days of trial. On June 18, 2013, the Montana Supreme Court affirmed the trial court's denial of postconviction relief. *Rose v. State*, 304 P.3d 398 (Mont. 2013) ("*Rose II*"). Rehearing was denied on July 23, 2013. Order at 1, *Rose II*, No. DA 12-0167 (Mont. filed July 23, 2013), *available at* http://supremecourtdocket.mt.gov (accessed Dec. 16, 2014).

Rose filed his federal petition on July 24, 2013. The State does not assert a statute of limitations defense, *see* Answer (Doc. 8), *passim*, and the petition appears to be timely filed, 28 U.S.C. § 2244(d)(1)(A).

## II. Claims and Analysis

Rose presents several claims for relief. Some were decided on the merits by the Montana Supreme Court on direct appeal or on postconviction appeal. As to some of those claims, Rose asserts he was unfairly prevented from making a full presentation of the claim. Rose also presents some claims that were not decided on the merits by the Montana Supreme Court.

The Court has reviewed the voluminous record and considered all of Rose's

10

claims and arguments. Two claims warrant further proceedings. The first is Rose's claim that counsel performed ineffectively in connection with a plea offer (Claim 2). The second is his claim that his right to a speedy trial was violated (Claim 6). That claim is separate from his claim that appellate counsel was ineffective in connection with his right to speedy trial (Claim 12), which should be denied.

For the reasons set forth below, all claims excepting Claim 2 and Claim 6 should be denied at this time because they lack merit.

## A. Claims To Be Denied

While the Court acknowledges the standards of 28 U.S.C. § 2254(d), the claims recommended for denial are so clearly lacking in merit that they would be denied even if addressed on a *de novo* basis, regardless of § 2254(d) and regardless of any issue of exhaustion or procedural default. *See, e.g., Johnson v. Williams*, __ U.S. __, 133 S. Ct. 1088, 1096-97 (2013); *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc); 28 U.S.C. § 2254(b)(2).

## 1. Overnight Recess and Self-Representation (Claim 1)

Rose contends that his right to the effective assistance of trial counsel was violated when Sather failed to consult with him for an adequate time during the overnight recess between the first two days of trial and when she failed to make an adequate record to support a continuance so that he could consult with her. He

11

alleges he was prejudiced by the first error because he was forced to represent himself when, in reality, he wanted counsel. He alleges he was prejudiced by the latter error because appellate counsel could not raise the matter on direct review. Rose also contends that these allegations were unfairly dismissed on the grounds that they should have been raised on direct appeal, thus preventing him from developing the record to support the claim. Pet. (Doc. 1) at 4 ¶ 13A; *id.* at 9-17.

As with all claims of ineffective assistance of trial and appellate counsel, the legal standard for this claim is set by *Strickland v. Washington*, 466 U.S. 668 (1984); *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000). At this stage of the proceedings, Rose must allege facts sufficient to support an inference both that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

On the morning of the first day of trial, the trial court addressed Rose's complaints regarding Sather's performance. The court had previously appointed Sasha Brownlee to investigate those claims and to report whether any had substance. *See* Pro Se Pet. (Doc. 8-31) at 2; 1 Trial Tr. at 21:10-14. The trial court

12

repeatedly asked Rose to be specific about what Sather had done wrong or had not done. Although it was clear that Rose had intense interest in knowing everything he could about the case, his responses to the trial court's questions remained vague. Rose said Sather had not interviewed witnesses, but he did not identify any particular witnesses whom Sather had failed or refused to interview. 1 Trial Tr. at 21:15-29:24. On the one hand, he said that Sather "worked very hard . . . trying to chase these witnesses down," and, on the other hand, his comments suggested that the problem was not that Sather had not interviewed witnesses but that he had reviewed witness statements outside her presence, rather than sitting down with her to examine the statements. *Id.* at 26:7-24. Rose said the State's discovery, excepting reports relating to the pepper spray incident, had been "sitting under my bunk for I don't know how long," but he had not been able to review all of it with counsel. *Id.* at 26:13-24, 27:10-20. Sather added that Rose "wasn't happy" with the psychological evaluation, *id.* at 31:12-32:7, and Rose added, "It's not that I totally object to this defense. It's more of a [lack of] consultation and understanding of it that I'm arguing," *id.* at 37:16-19. The trial court found "no grounds for a legitimate complaint against Ms. Sather." *Id.* at 40:6-8. Trial commenced.

On the morning of the second day of trial, Rose moved to represent himself. He did not say that he felt he had no choice but to represent himself in light of his

13

inability to consult with counsel for sufficient time the previous night or in light of

the trial court's ruling on the mental-state defense.[1] He said:

> Mr. Rose:     Your Honor, I think it was October 28th when I addressed the Court about what the parameters might be of doing this, and you know, I'd like to hear that before signing over my right to counsel, make sure that I'm not put in a position where I don't have access to the law if need be, and – because it's limited down there in the detention facility. But one of the things that I wanted to add to what [Sather] was saying is her and I have kind of disagreed on defenses, and Mr. Corn and you are a little bit aware of that, on the mental defense, and I've never been dogmatic about not going that way. It's just that I feel there's some prejudicial things that – prejudicial effect, especially after some of the rulings yesterday by the Court. I don't want to deal with the prejudicial effect to me, my family, and everything else, of bringing up all my other crimes, wrongs or acts, if I go with the mental defense. And she's prepared for that and wants to go that direction. . . .

> The Court:    What's your motivation for not wanting an attorney?

> Mr. Rose:     I just – . . . I'm the one that's going to get found guilty of something, you know what I'm saying, and pay the price. It isn't here, and I feel there's some issues that

---

[1] Sather had prepared a mental-disease-or-defect defense, presumably planning to introduce expert testimony tending to show that Rose was not capable of acting knowingly or purposely. *See* Mont. Code Ann. § 46-14-102 (2001). On May 6, 2003, the State gave notice of its intent to use, in cross-examination and/or rebuttal, evidence that Rose used methamphetamine on prior occasions and committed criminally reckless acts under its influence. *Compare* Mont. Code Ann. § 45-2-101(42) (2001) *with id.* §§ -101(34), (64). On the morning of trial, the court ruled that evidence of Rose's prior acts – which included an incident in which Rose drove at high speed in the wrong direction on Interstate 15, nearly striking several vehicles and colliding with one – could be admitted to rebut any expert testimony that Rose had a mental disease or defect. The trial court noted that "the literature is pretty clear, isn't it, that methamphetamine abuse can mimic certain mental disorders." 1 Trial Tr. at 62:3-71:1.

haven't been covered fully that I want to bring up, or some cross-examinations or whatever that I want to bring up, that I could maybe better understand, because she's prepared herself with a defense of mental defect and I've totally focused on some other things, so it's hard to explain the motivation of not wanting her. I don't know. We have talked, kind of, about that, but –

. . .

Sather:     . . . [I]t's kind of a control issue for Robert. The attorney gets to make the decisions on the procedural things. He gets to decide whether he wants to testify, but he's limited to those things. And I've been telling him, no, this is kind of the way I'm going to do it because I'm an attorney. If he represents himself, he can do it the way he wants to, and he – basically what Sasha said was he wants me to do what he wants me to do, and it's not that I think he necessarily thinks I'm ineffective or that we're having personality problems or anything like that, it's just differences on how to proceed, and I think he has every right to represent himself.

. . .

The Court:  Well, you understand there's an awful lot more at stake here than there is on a criminal trespass charge?[2]

            . . .

            . . . Have you thought about this?

Rose:       Yes, I have, Your Honor. I thought about it real hard yesterday and then discussed some things with Kelli, and I just – if – and I'd like to go there again, the prejudicial – if the prejudicial effect weren't so great in the defense she wanted to present, I would let her

---

[2] The court was referring to a prior case in which Rose represented himself and obtained an acquittal on a criminal trespass charge.

> continue on. That's one of the big issues.
>
> The Court: Well, have the two of you talked about that, I mean, if you don't want to proceed with that, you feel that –
>
> Sather: I feel that if we don't proceed with that, I actually don't feel as prepared at all, and I feel like he – what we have left, he's much more informed on that than I am.

2 Trial Tr. (Doc. 8-39) at 284:5-290:7.

Rose exhibited no concern at all regarding time to consult with counsel in the overnight recess. He referred instead to his longstanding interest in self-representation. *See* Mot. Hr'g Tr. (Doc. 8-22) at 2:3-4:11. He was thoughtful about the matter, but thoughtfulness is not equivocation.

Rose's desire to represent himself fatally undermines his claims. There is no reason to suspect that he would have chosen to proceed with counsel even if Sather had consulted with him for several more hours. Neither prong of the *Strickland* test is met. As against Sather, the claim should be denied for lack of merit.[3]

Because there was not a sufficient record to support an appeal of the issue on

---

[3] In the state postconviction proceedings, Rose introduced a log he had purportedly kept of his contacts with all his attorneys. The trial court described this entry on February 10, 2003:

> Sather visited to discuss Dr. Davis's report. Rose told her his case was being handled "backwards." He told her *she* needed to gather all evidence, talk to all witnesses, and file all pretrial motions before *he* could know the best defense strategy.

Order (Doc. 8-79) at 51 (emphasis added). This description strikes this Court as emblematic of the case. The Sixth Amendment does not guarantee the kind of assistance from counsel that Rose had in mind.

16

the grounds Rose identifies, appellate counsel was not ineffective. As against appellate counsel, Rose's claim should be denied for lack of merit.

Although Rose's opportunity to develop factual support for this claim in state postconviction proceedings might be relevant to procedural default, *see Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309, 1320 (2012), default is not at issue here. There simply is no reason to think that Rose could, by adducing additional facts, prove the *Strickland* claim he alleges.

This claim should be denied in its entirety.

### 2. Claims 3 and 4: Right to Be Present

Rose asserts that his right to be present at plea negotiations was violated when Sather met with Corn but without Rose, Pet. at 26-29, and when two pretrial conferences were held without him, *id.* at 30-31.

"[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure," *Kentucky v. Stincer*, 482 U.S. 730, 740 (1987), that is, "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge," *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934). The defendant need not be present "when [his] presence would be useless, or the benefit but a shadow." *Id.* at 106-07.

A plea *agreement* has a dramatic impact on the defendant's opportunity to defend a charge. Plea *negotiations* have no impact on the opportunity to defend. This portion of Rose's claim should be denied.

Although Rose claims he was unfairly excluded from two pretrial conferences, he names only one, on October 28, 2002. *See* Pet. at 30. Both the minutes and the transcript of that proceeding show that Rose was present and participated in the conference. Mot. Hr'g Tr. (Doc. 8-22), *passim*; *see also* Minutes (Doc. 8-22) at 1-2. This portion of Rose's claim is frivolous.

This claim should be denied in its entirety.

### 3. **Claim 5: Waiver of Counsel**

Rose claims his waiver of his right to counsel at trial was equivocal and the trial court erred in permitting him to represent himself. Pet. at 32-34. Rose's waiver was unequivocal. *See supra* at 15-17. This claim should be denied.

### 4. **Claim 7: Appointment of Counsel to Investigate Complaints**

Rose contends that he was denied the benefit of counsel when the trial court appointed Sasha Brownlee to investigate his complaints against Sather. Brownlee, Rose contends, shared an office with Sather and was "best friends" with her. Pet. at 36.

Assuming Brownlee had a conflict of interest, Rose fails to show any reason

18

to suspect that her conflict actually affected the adequacy of her investigation of Rose's allegations about Sather's performance. *See Mickens v. Taylor*, 535 U.S. 162, 168 (2002). Brownlee's conclusion that Rose wanted Sather to do what he believed an attorney should do is amply supported by the record. The law does not guarantee a defendant an attorney who merely executes his instructions. Although Rose makes many complaints about what Sather did or did not do, he fails to show any actual professional deficiency in her performance that Brownlee could have identified. This claim should be denied in its entirety.

### 5. Claim 8: Ineffective Assistance of Counsel

As stated, *see* supra at 11-12, claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Rose must allege facts sufficient to support an inference (1) that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Id.* at 697.

### a. Mansch and Gahagan

Rose contends that the first two lawyers appointed to represent him, Larry

Mansch and Dusty Gahagan, failed to file any motions or otherwise subject the prosecution's case to adversarial testing. Pet. at 37. These allegations fail to support any inference that either lawyer performed deficiently or caused any prejudice to Rose.

Rose also alleges that counsel failed to present a favorable plea agreement to him. These allegations show that Rose would not accept an offer until he saw one in writing, and he did not receive an offer in writing at that time. Pet. at 18-21.[4] Therefore, he cannot show prejudice.

All claims relating to Mansch and Gahagan should be denied for lack of merit.

### b. Volunteered Statements

Rose also claims that Sather and Mansch were ineffective because neither filed a motion to suppress "my statement that was improperly compelled by jail officials regarding questions about my use of drugs, and questions about the pepper-spray incident." Pet. at 38. Although Rose does not describe any of these statements, testimony at trial showed the following. First, at the hospital, Rose and his parents told an officer that Rose did not want to make a statement until he

---

[4] Although Rose sets forth this claim under the heading of Claim 2, it is addressed here with his other claims of ineffective assistance of counsel as part of Claim 8. For purposes of clarity, Claim 2 is deemed limited to only that portion alleging ineffective assistance in connection with the State's written plea offer of May 21, 2003, Pet. at 22-25.

"came down off the drugs." 2 Trial Tr. at 463:18-464:18; *id.* at 474:9-25. Second, on January 16, Rose told another officer he "had something in his system that caused his problems on January the 10th, 2002." *Id.* at 2 Trial Tr. (Doc. 8-39) at 321:3-20; *see also id.* at 365:2-368:6, 378:4-379:8 (testimony that Rose was warned not to make a statement). Third, the officer who testified that Rose assaulted him with pepper spray also testified that Rose apologized for doing it. 3 Trial Tr. (Doc. 8-40) at 665:15-666:11.

"[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). An "interrogation" consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. "Volunteered statements of any kind" may be used against the defendant, whether made while he is in custody or not, so long as the statement is not made in response to "interrogation." *Id.* at 300 (quoting *Miranda v. Arizona*, 384 U.S. 436, 478 (1966)).

In neither Rose's federal nor in his state postconviction petition and brief, *see* Pet. at 38 ¶ 1, does he allege that he made any of these statements in response to interrogation. *See* Postconviction Pet. (Doc. 8-77), *passim*. His claim is simply

21

that his rights were not read to him when he was taken into custody. Postconviction Pet. at 21 ¶¶ 65-67. As no warning was required regarding these volunteered statements, this portion of Rose's claim should be denied.

### c. Statement in Booking

During the booking process, Rose was asked whether he was under the influence of drugs. In response, Rose said his girlfriend had given him something but he did not know what it was. 3 Trial Tr. (Doc. 8-40) at 666:14-667:16. Rose was undoubtedly in custody. A reasonable officer would think that asking someone whether he is on drugs would likely elicit an incriminating response. Consequently, Roses' statement in booking should not have been admitted.

This statement is one a lawyer would typically object to during trial. Rose did so, but the objection was overruled. Sather, by contrast, had no reason to believe she must file a pretrial motion in limine to exclude that statement just in case the judge might make the wrong call at trial. Counsel's performance must be judged from her perspective at the time. *Strickland*, 466 U.S. at 689.

Further, Rose was not prejudiced. From the moment Rose told Davies that his girlfriend had put something in his hot chocolate until the day he testified before the jury, Rose consistently claimed he did not know what was wrong with him but he might have ingested something that made him feel confused and

22

frightened and made him behave the way he did. *See, e.g.*, 2 Trial Tr. (Doc. 8-39) at 486:17-22; 3 Trial Tr. (Doc. 8-40) at 668:21-669:23, 858:22-860:11, 867:15-868:4. Rose's statement at booking was consistent with his position at trial. There is no reasonable probability that Rose would have been acquitted if only the statement at booking had not been admitted. Neither prong of the *Strickland* test is met.

### 6. Claim 12: Ineffective Assistance of Appellate Counsel

In connection with his claim of a speedy trial violation, Rose claims that counsel appointed on appeal failed to "marshal all of the evidence Rose needed to bolster his proof of speedy trial prejudice" when the Montana Supreme Court remanded the case for an evidentiary hearing on the speedy trial claim. Postconviction Pet. (Doc. 8-77) at 61, *referenced in* Pet. at 35; Pet. at 45-46 ¶¶ 6-14. The standards for a claim of ineffective assistance of appellate counsel are the same as those governing claims of ineffective assistance of trial counsel. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

Attorney Chad Wright represented Rose at the seven-hour evidentiary hearing, *see* Speedy Trial Hr'g Tr. (Doc. 22-4) at 7:1-20, 111:4-7, 255:20, and on appeal. Rose asserts that he explained to Wright "the significance of the evidence I needed to present to the court during remand procedures during direct appeal" and

23

was "vigil[a]nt in my efforts to bring all necessary facts before the trial and appellate court, to no avail." Pet. at 35. These assertions are no doubt true. But their truth does not mean counsel was ineffective.

Wright did not move to reopen the evidentiary hearing in the wake of *Ariegwe*, but there is no reason to think such a motion would have succeeded. The Montana Supreme Court's opinion specifically noted that "the factual record concerning Rose's speedy trial motion is comprehensive and complete, and the District Court has made the necessary findings of fact for application of the *Ariegwe* analysis." *Rose*, 202 P.3d at 758 ¶ 37.

Wright did, however, move for oral argument to allow the parties an opportunity to re-assess the evidence in light of the new *Ariegwe* test. The Montana Supreme Court denied the motion. Notice and Request for Oral Argument at 1-3, *State v. Rose*, No. DA 05-129 (Mont. Oct. 5, 2007); Order at 1, *Rose*, No. DA 05-129 (Mont. filed Oct. 31, 2007), *available at* http:// supremecourtdocket.mt.gov (accessed Dec. 15, 2014).

Rose's claim consists essentially of the proposition that Wright's presentation must have been defective or Rose would have prevailed, because Rose believes the prejudice he experienced was great enough to warrant dismissal of the charges. *See, e.g.*, Postconviction Pet. Ex. 69 (setting forth a detailed 11-page

24

analysis from Rose to Wright, applying the facts of his case to the analysis in *Ariegwe*). The Court has reviewed all the exhibits that were attached to Rose's postconviction petition in addition to all the exhibits attached to the State's Answer and all exhibits submitted to this Court by Rose. None of these documents provide reason to believe that Rose could allege facts sufficient to support an inference that Wright performed unreasonably either at the evidentiary hearing or on appeal. Nor is there a reasonable probability Rose's case would have been dismissed if Wright had done something more or different than he did with respect to Rose's showing of prejudice from the alleged speedy trial violation. The claim that counsel was ineffective in connection with the speedy trial claim should be denied for lack of merit.

### 7. Claim 9: Destruction of Legal Materials

Rose claims he was not able to develop his postconviction claims in state court because prison officials destroyed his legal materials in violation of the First and Fourteenth Amendments. Pet. at 39. He has not identified any claim he was unable to assert. This claim should be denied.

### 8. Claims 10 and 13: Judicial Bias

More than three weeks after he was convicted at trial on June 6, 2003, Rose moved to disqualify Judge Langton. Rose contended that, when Judge Langton was

a practicing attorney, he represented Rose's ex-wife in uncontested proceedings resulting in her divorce from Rose in 1990; that Rose owed attorney Langton some portion of $125.00 for an hour's worth of attorney services Langton provided to Rose sometime between 1990 and 1992; that, one week after trial of this matter, Rose sued Judge Langton in federal court; and that Judge Langton ruled against Rose in the criminal matter. *See* Pet. at 40; Mot. to Disqualify (Doc. 8-42).

On their face, these claims appear frivolous. "[E]xtreme facts" are required to create "an unconstitutional probability of bias." *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 887 (2009). And "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). This Court's review of the proceedings shows that Judge Langton's actions and remarks were uniformly unobjectionable.

The occasion on which Rose was removed from the court room constitutes his Claim 13, *see* Pet. at 47, but it is a good example of Rose's unreasonable construction of Judge Langton's actions. Rose was indeed removed from one hearing, viz., the hearing on his motion for a new trial. Long before that hearing, Rose filed his motion to disqualify Judge Langton. At the behest of the Montana Supreme Court, Judge John Larson of Montana's Fourth Judicial District heard Rose's motion to disqualify. Judge Larson permitted extensive briefing and

supplementation of the motion to disqualify, conducted an evidentiary hearing, and issued a 17-page order denying the motion to disqualify Judge Langton. Six weeks after that, Judge Langton held the hearing on Rose's motion for new trial. At that hearing, Rose aired additional complaints about Sather's assistance, both in her role as counsel before trial and in her role after trial as standby counsel. The exchange resulting in Rose's removal from the courtroom begins on page 112 of the 116-page transcript of the hearing on Rose's motion for new trial:

The Court:    Do you have anything else you want to say?

Rose:    Yes. I would like to let it be known that I didn't get to call the witnesses I needed here today. I didn't have –

The Court:    We have already heard about that. Is there anything else you want to add?

Rose:    Can I call Mr. Corn [the trial prosecutor] as a witness [on Rose's allegations of prosecutorial misconduct at trial and outrageous government conduct in connection with Rose's pretrial incarceration]?

The Court:    No. Is there anything else you want to add?

Rose:    I would like some sort of guarantee from the Court that I can have a fair hearing tomorrow [at sentencing].

The Court:    You'll always get a fair hearing from me, Mr. Rose. Is there anything else you want to add?

Rose:    How do you figure that? I have never got a fair hearing with you, ever.

| The Court: | Good. |
|---|---|
| Rose: | I didn't get a fair trial with you. |
| The Court: | I think Mr. Rose needs to go back to jail. Standby counsel will take over for the balance of the hearing. |

Mot. Hr'g Tr. (Doc. 8-57) at 112:5-113:2. The hearing was concluded after a few more remarks among the lawyers and the trial court about the nature of Rose's complaints against counsel and anticipated postconviction proceedings. *Id.* at 113:3-116:16.

The Court will assume, for the sake of argument, that Judge Langton's comment, "Good," was said in a tone of satisfaction rather than an ironic tone indicating fatigue. Regardless, any fair-minded jurist would recognize that Rose was an exhausting litigant to deal with. Judges, like other human beings, sometimes encounter repetitive complaints from others. Like other human beings, judges sometimes vent their exhaustion. Judge Langton's comment, "Good," and his observation that it was time for Rose to leave the courtroom did not rise anywhere near the level of a due process violation. Rose's removal from the new trial hearing caused Rose no prejudice, because the hearing had concluded. Rose's other proffered reasons for Judge Langton's disqualification were inconsequential.

The record demonstrates that Judge Langton was patient and accommodating throughout proceedings that Rose made surprisingly protracted.

28

This claim should be denied.

### 9. Claim 11: Destruction of Exculpatory Evidence

Rose claims the prosecution destroyed exculpatory evidence, Pet. at 42-43, but there is no reason to suppose the evidence he describes would have had exculpatory value. Rose and Davies fought inside the cab of the truck. There is no reason to believe that fingerprint or blood evidence, or the absence of either, would have been probative of anything. *See, e.g.*, 4 Trial Tr. at 1035:5-18. Assuming, for the sake of argument, the door of the truck could not be locked, there is no reason to believe Davies knew that. At any rate, Davies could reasonably have believed it was not safe for him to try to get away from Rose even if the door was unlocked; slowing down and stopping would give Rose plenty of time to make an attack. As for Rose's claim that a "lost" cell phone would have "identified witnesses I spoke to at relevant time periods before and during the trip," there is no reason to think the phone was anything other than "lost," and, again, Rose could have identified those witnesses himself. He did not indicate that his alleged lack of understanding of his actions during the trip rendered him unable to speculate afterward as to whom he might have called during that time. None of these items, whether considered singly or all together, support an inference that Rose might not have been convicted if only any or all of these items of evidence had been presented to

29

the jury. *See United States v. Agurs*, 427 U.S. 97, 112-13 (1976).

Rose also mentions another cell phone. Joyce Robertson testified that a few days after Rose's arrest she gave the police Rose's cell phone. 3 Trial Tr. (Doc. 8-40) at 812:3-813:3. Even assuming that is true, and further assuming the police lost or destroyed it as well, Rose offers no reason to believe that phone calls he made before he went to the construction site on the morning of January 10 were relevant to what happened between him and Davies.

This claim should be denied in its entirety.

### B. Claims Requiring Further Proceedings

As to two of Rose's claims, the Montana Supreme Court's decision was unreasonable. Following a thorough review of the parties' pleadings and all 160-odd exhibits before the Court, the Court cannot make a reliable *de novo* determination of those claims at this time. Further proceedings are required. By separate Order, Rose is directed to state whether he wishes to proceed pro se or whether he wants new counsel to be appointed to represent him.

### 1. 28 U.S.C. § 2254(d)

Where a state court has denied relief on the merits, a state prisoner may obtain federal habeas relief only if the state court's denial of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States," or if the state court's denial was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

Under § 2254(d)(1), a state court decision is "contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [its] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court's decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011).

Under § 2254(d)(2), a petitioner might challenge a state court's findings on the record on the grounds "that the finding is unsupported by sufficient evidence, that the process employed by the state court is defective, or that no finding was made by the state court at all." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir.

31

2004) (internal citations omitted). Under Ninth Circuit law, "[o]nce the state court's fact-finding process survives this intrinsic review . . . the state court's findings are dressed in a presumption of correctness" and can only be rebutted by "clear and convincing evidence." *Id.* at 1000 (citing 28 U.S.C. § 2254(e)(1)).[5]

## 2. Claim 2: Plea Agreement

Rose claims attorney Kelli Sather was ineffective because she discussed a written plea offer with George Corn, the county attorney, before she told Rose about it. So expressed, the claim is frivolous. Defense counsel is not required to present an offer to a client before talking about it with the prosecutor who is making the offer. Such a rule would make every conversation between defense counsel and prosecutor a potential Sixth Amendment violation merely because a plea offer happened to be pending. But it is unreasonable for a lawyer to fail altogether to tell a client about a plea offer, and it appears Rose did not know about Corn's written plea offer until counsel produced it to Rose almost a year later, in March 2004.

The record indicates a real possibility that all did not proceed as it should have. The structure of the sentence Corn proposed in the offer – not the prison term

---

[5] The State's Answer asserts that all factual findings of the Montana courts are presumed correct unless rebutted by clear and convincing evidence. This position does not appear to be consistent with *Taylor*.

he proposed to recommend – appears to have been the sticking point. The issue was whether Rose's designation as a persistent felony offender ("PFO") would result in a separate sentence consecutive to the sentence for the underlying felony conviction or, alternatively, whether the persistent felony offender sentence replaced the otherwise available sentence on the felony conviction. Sather correctly understood that the latter was required. Nonetheless, under the terms of Corn's offer, the maximum sentence the State could have requested at sentencing would have been 30 years with 5 suspended. Without the offer, the State could request any sentence up to 220 years.[6] The offer was very favorable to Rose.

Sather's affidavit says that, on May 22, 2003, she "made a counter-offer . . . in light of the illegal sentencing [sic] he was offering." Sather Aff. (Doc. 8-81) at 1

---

[6] If convicted on all counts at trial and if all terms ran consecutively, Rose faced a maximum sentence of life or 100 years for aggravated kidnapping, Mont. Code Ann. § 45-5-303(2) (2001); plus 10 years for assault on a peace officer, *id.* § -210(2)(a); plus 20 years for assault with a weapon, *id.* § -213(2)(a). With a PFO designation, the maximum sentence on either the second or the third count would be raised to 100 years, and there would be a five-year mandatory minimum. *Id.* § 46-18-502(2). The maximum available sentence then would have been 100 years + 100 years + 20 years, that is, 220 years.

The first paragraph of Corn's letter wrongly stated that Rose's maximum sentencing exposure was 230 years, that is, 100 years + 10 years + 20 years + 100 years as a PFO. The Montana Supreme Court's cases on PFO sentencing changed course, or at least emphasis, over the years, but none ever said that. *See generally State v. Gunderson* ("*Gunderson II*"), 237 P.3d 74 (Mont. 2010). Corn offered to drop the aggravated kidnapping charge and the charge of assault on a peace officer; to let Rose enter an "open" plea to assault with a weapon; to limit the PFO sentence to 10 years with 5 suspended; and to run the PFO sentence consecutive to the sentence for assault with a weapon. Although that sentence was well within the maximum sentence available under a PFO designation, it was indeed illegal in its form. *See* Corn Letter to Sather (Doc. 8-82) at 1-2.

¶ 4. The record does not indicate what Sather said; perhaps she suggested a lesser

sentence, or perhaps she suggested a different configuration for the sentence that

would be unobjectionable. At any rate, at that point, Sather says:

> Mr. Corn became angry with me and said he was withdrawing the
> plea offer. In his May 21, 2003 letter, he had indicated the offer was
> open until 4:30 on Friday, May 23, 2003. Mr. Corn would not discuss
> a plea agreement with me after that date.
>     Mr. Rose was not allowed to accept the plea offer due to Mr.
> Corn withdrawing the offer at the May 22nd meeting.

Sather Aff. at 1-2 ¶¶ 5-6; *see also* Hr'g Tr. (Doc. 8-57) at 65:15-67:19. The record

does not indicate whether Sather's phrase "after that date" meant after her

discussion with Corn on May 22 or after 4:30 p.m. on May 23. It is reasonably

clear, however, that two attorneys acting in good faith should have been able to

recast the form of Corn's offer in terms that would have been both legal and

consistent with Corn's evident intent in making the offer.

If Sather's account of events is accurate, Corn's unpredictable behavior may

have initiated a valid claim of ineffective assistance on the part of defense counsel.

Because no record was made in the state proceedings as to what exactly Sather and

Corn said and did, it is not clear whether Sather performed in a professionally

unreasonable manner or whether Rose suffered prejudice as a result.

The trial court denied this claim on the grounds that Rose would not have

accepted a plea offer anyway. Order (Doc. 8-79) at 65-68. This finding was made

without taking any testimony on the point from either Rose or Sather; it was based on the trial court's assessment of Rose's conduct of the case in open court and in the letters he sent to the court. Those events occurred when Rose was not aware that the prosecution had actually made, in writing, a highly favorable plea offer. The finding also tacitly endorsed Corn's premature "withdrawal" of the offer in a manner that appears inconsistent with both the written deadline in the offer and a prosecutor's obligation to provide due process of law. The trial court also noted that Rose failed to take responsibility for his actions at trial. It is unreasonable to find that a plea offer would not have been accepted because the defendant did not admit guilt at trial. But, in addition, this finding ignores the fact that Corn offered to accept a no-contest plea, not a guilty plea. Finally, the trial court relied on Rose's statement in an appellate brief that he could not entertain a plea offer without first knowing exactly what all the evidence was. Order at 67-68. The point made in the brief was that Rose "did not have an informed idea or opinion about the strength or weakness of the State's case," Order at 68 (quoting brief), and the point was made by counsel, not by Rose personally. At any rate, the assertion proves too much; regardless of whether Rose pled guilty or went to trial, the same risk was entailed in not knowing exactly what all the evidence was. The Montana Supreme Court did not rely on the finding. The evidence was not sufficient to

support the trial court's finding, and the failure to take testimony on the point at issue, especially from Sather, was also unreasonable. *Taylor*, 366 F.3d at 999-100.

The Montana Supreme Court denied the claim because the sentence Corn offered was in fact illegal. "Rose should not be allowed to advance a plea agreement as a basis for his IAC claim where subsequent case law renders the terms of that agreement illegal." *Rose*, 304 P.3d at 392 ¶ 23. This decision, too, was based on an unreasonable determination of the facts of the case. There was no plea *agreement*, only a plea *offer*. The evidence before the court showed that Sather went to Corn precisely *because* she knew the terms of the proposal were illegal, and she wanted to discuss them with Corn so they could arrive at a legal sentence. No other facts in the record show what actually happened in the plea negotiations. Nor does the record show whether there was any possibility of holding Corn to the written deadline in the offer or, if so, whether Sather considered means to do so. It was unreasonable to deny Rose's claim on the grounds that Corn's offer was illegal when the gravamen of the constitutional claim concerns what did or did not happen when that illegality became apparent.

Moreover, the decision was an unreasonable application of the prejudice prong of the *Strickland* test. In the context of a guilty plea, the prejudice prong "focuses on whether counsel's constitutionally ineffective performance affected

36

the outcome of the plea process," *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), that is, whether there is a reasonable probability the defendant would have pled guilty rather than standing trial were it not for counsel's deficient performance, *id.* The trial court's finding was, therefore, the right one to make, although its finding was not reasonably made.

It is worth pointing out that the sentence Rose is currently serving, while being significantly longer than the maximum that would have been possible under Corn's offer, suffers from the same formal defect as Corn's proposal. *See* Judgment (Doc. 8-61) at 3 ¶¶ 1-5 (imposing consecutive sentences for each of three felony convictions plus an additional consecutive term on the PFO designation). The illegality of Corn's offer and Rose's actual sentence alike can only be fairly described as a matter of form, not of substance. It is at least problematic to hold that Rose is not entitled to the benefit of a sentence illegal in its form, because it is illegal, when he is actually serving a sentence illegal in its form. It is especially problematic to do so where the prosecutor's abrupt "withdrawal" of the offer strongly appears to have been "based on considerations that, as a matter of law, ought not to inform the inquiry." *Rose II*, 304 P.3d at 393 ¶ 25 (quoting *Lafler v. Cooper*, __ U.S. __, 132 S. Ct. 1376, 1387 (2012)).

In sum, although Sather may not bear the greatest share of responsibility for

the abortive plea negotiations in late May 2003, her performance may have been unreasonable, and Rose might have been prejudiced. Further proceedings are required.

### 3. Claim 6: Speedy Trial

On direct appeal, Rose presented a claim that his right to a speedy trial was violated. Because the record was insufficient, the Montana Supreme Court remanded the matter for an evidentiary hearing. Following a 7½-hour hearing spread over two days in November 2006, the trial court entered findings and conclusions on June 20, 2007. *See* Order (Doc. 8-68). On August 16, 2007, after the parties had filed supplemental briefs in the Montana Supreme Court, the court decided *State v. Ariegwe*, 167 P.3d 815, 826-60 ¶¶ 17-55 (Mont. 2007), which altered speedy trial analysis under state law. In a lengthy and detailed analysis, the Montana Supreme Court denied the speedy trial claim on January 13, 2009. *Rose*, 202 P.3d at 759-64 ¶¶ 41-92.

In this Court, Rose asserts that his right to a speedy trial was violated by the 507-day delay between charge and trial. Pet. at 35. Although it is clear that Rose personally contributed to the extenuation of the state court proceedings, the Montana Supreme Court's resolution of the speedy trial claim was an unreasonable application of *Barker v. Wingo*, 407 U.S. 514 (1972), and was based at least in part

on an unreasonable determination of the facts.

The court analyzed the reasons for the delay by identifying the dates of defense motions, counting days between the motion and the next deadline, hearing, or trial date, and attributing those days to Rose. At the conclusion of this process, it subtracted all the days of delay it attributed to Rose from the total delay of 507 days and attributed the remainder of the days to the State. *See Rose I*, 202 P.3d at 760-61 ¶¶ 47-58. This analysis omitted the trial court's responsibility for assuring that trial is held in a speedy manner. *Barker*, 407 U.S. at 529.

For instance, the court attributed seven days of "delay" to Rose because, at his arraignment, he requested a week to review discovery before he entered a plea. Another 21 days were attributed to Rose because the trial court gave him that time to decide whether to *file* a motion for change of venue. During neither of those periods of delay was a trial date or a plea deadline set. Instead, on March 6, the court set a deadline of April 18 for the parties to hold a settlement conference. The trial court did not *set* a trial date until 104 days had already passed since Rose's arrest, and at that time trial was set for July 29, 2002, 199 days after Rose's arrest. *Rose I*, 202 P.3d at 760 ¶¶ 49-51.[7] On July 11, when Rose moved for additional

---

[7] Judge Langton was, at this time, the only judge in Ravalli County and the busiest trial judge in the State. While his position was indeed difficult, it did not shift the burden of obtaining a speedy trial to Rose, who had "no duty to bring himself to trial." *Barker*, 407 U.S. at 527.

time to prepare and filed a waiver of his right to a speedy trial, the court continued
trial for 112 days, from July 29 to November 18, 2002, and set a preliminary
pretrial conference for October 25. There is no evidence in the record to indicate
why that delay was so long. Although Rose requested a psychological evaluation
on October 25, there is no indication the motion was untimely. It is not clear why
the entire period of time between July 29 and October 25 should be attributed
solely to Rose.

Rose's October 2002 motion for a psychological evaluation resulted in
attribution to him of 171 days of delay. *Rose I*, 202 P.3d at 760 ¶¶ 54-55. There is
no evidence showing why the evaluation took as long as it apparently did. The trial
court reasonably chose not to set a trial date until Rose's competency could be
assessed and he could decide whether to proceed pro se or with counsel. But the
trial court did not set a deadline for resolution of the competency question or
completion of the evaluation – it set *no* deadlines for that period of time. By the
time a new trial date was set, the first available date was another two months down
the road. *See, e.g., Rose I*, 202 P.3d at 774-75 ¶¶ 157-163 (Nelson, J., dissenting);
*see also State v. Couture*, 240 P.3d 987, 1008 ¶ 74 & n.3 (Mont. 2010) (limiting
*Rose I*). The Montana Supreme Court's analysis failed to account for the fact that
the prosecution and the trial court share responsibility for providing a speedy trial.

40

Defense motions certainly are relevant, especially to the defendant's assertion of the right to a speedy trial, *see Barker*, 407 U.S. at 531-32, but attributing to the defense all delay that is initiated by a defense motion is likely to cause misattribution of any unreasonable extenuation of delay. For that matter, Rose's interest in a speedy trial despite his desire to defend himself was evidenced as early as July 12, 2002, Rose Letter (Doc. 8-14) at 1-2, contrary to the Montana Supreme Court's emphasis on Rose's submissions to the trial court in the spring of 2003, *Rose I*, 202 P.3d at 761 ¶ 61.

The analysis in this case was unreasonable because it failed to consider the trial court's responsibility for bringing cases to trial. *Id.* at 529. Relief is not precluded on this claim because the standards of 28 U.S.C. § 2254(d)(1) and (2) are met. Because there was misattribution of delay and the record is silent on the reason for some lengthy periods of delay, and because the facts can significantly alter the "difficult and sensitive balancing process" under *Barker*, further proceedings are required.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

All of Rose's claims should be DENIED for lack of merit, except for Claim 2, alleging violation of the right to the effective assistance of counsel in plea

negotiations in late May 2003, and Claim 6, alleging violation of Rose's right to a speedy trial.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Rose may object to this Findings and Recommendation within 14 days.[8] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

<u>Rose must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address."</u> Failure to do so may result in dismissal of his case without notice to him.

DATED this 6th day of January, 2015.

_/s/ Jeremiah C. Lynch_
Jeremiah C. Lynch
United States Magistrate Judge

---

[8] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.