

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ROBERT L. ROSE,<br><br>Petitioner,<br><br>vs.<br><br>LEROY KIRKEGARD; ATTORNEY GENERAL OF THE STATE OF MONTANA,<br><br>Respondents. | Cause No. CV 13-156-M-DWM-JCL<br><br>FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |

This case comes before the Court on Petitioner Robert Rose's application for writ of habeas corpus under 28 U.S.C. § 2254. At this juncture two of Rose's claims remain: Claim Two, regarding the alleged ineffective assistance of counsel that Rose received during the plea bargaining process; and, Claim Six, relating to a purported violation of Rose's right to speedy trial. For the reasons discussed, Rose should be granted habeas relief with respect to his claim of ineffective assistance of counsel. But his speedy trial claim is properly rejected.

On March 26, 2015, this Court entered a Scheduling Order upon the joint request of the parties. (Doc. 39). The parties were granted leave to depose three individuals and were granted limited discovery relevant to the speedy trial claim.

1

*Id.* at 3. The parties were ordered to file briefs on the merits on the remaining two issues. *Id.* at 4. The issues have now been briefed. *See*, (Docs. 55-57; 59- 65; and 68-69 ). On January 13, 2016, a hearing was held to address Claim 6; the parties also presented argument relating to Claim 2. This matter is ready for adjudication.

## I.    Claim 2- Ineffective Assistance of Counsel

Rose alleges that trial counsel was ineffective for failing to convey a favorable plea offer. In support of his claim, Rose relies primarily upon *Missouri v. Frye*, 132 S. Ct. 1399 (2012), and *Lafler v. Cooper*, 132 S. Ct. 1376 (2012). Specifically, Rose claims that attorney Kelli Sather's failure to communicate a plea offer to Rose prior to its expiration constitutes unconstitutionally deficient performance. (Doc. 60 at 12).

### a. Factual Background

In January of 2002, Rose was charged with Aggravated Kidnapping, Assault with a Weapon, and Assault on a Peace Officer. The State subsequently filed a Persistent Felony Offender Designation. (Doc. 8-6 at 3). In June of 2002, an initial plea offer was made to Rose in which the State offered to reduce the Aggravated Kidnapping charge to simple Kidnapping. In exchange Rose would have pled guilty to Kidnapping, Assault with a Weapon, and Assault on a Peace Officer. Under the terms of this proposal, the net maximum sentence Rose could

have received was 40 years.[1]

Rose's trial, originally scheduled for July 31, 2002, did not take place. Following two changes in counsel, a psychological evaluation, and other scheduling challenges, discussed further below, Rose's trial was ultimately scheduled for June 2, 2003.

With a trial date fast approaching, the parties attempted to engage in a final effort at negotiating a plea. Prosecutor George Corn sent a written offer to defense counsel Sather on May 21, 2003. (Doc. 8-82). In the offer, Corn agreed to dismiss the felony charges of Aggravating Kidnapping and Assault on a Peace Officer, in exchange for Rose entering "open" pleas to felony Assault with a Weapon and one count of misdemeanor Assault. *Id.* at 1. Corn proposed the two sentences would run consecutively to one another. *Id.* He also agreed to cap his recommendation relative to the Persistent Felony Offender sentence at 10 years with 5 suspended with that sentence running consecutively to the Assault with a Weapon. *Id.* Under the terms of Corn's proposal, each party would remain free to argue for appropriate terms and length of sentence and Corn agreed not to object to a "no contest" plea.

---

[1] Under M.C.A. 45-5-302(2), Kidnapping carries a maximum sentence of 10 years; M.C.A. 45-5-210(2)(a) provides a maximum sentence of 10 years for Assault on a Peace Officer; and, Assault with a Weapon carries a maximum sentence of 20 years pursuant to M.C.A. 45-5-213(2)(a). It is unclear; however, exactly what the State's position was in relation to the Persistent Felony Offender Designation in this offer. Although this offer was never reduced to writing, it appears that the State did not seek an additional enhancement for the designation and that it was commonplace in Ravalli County to move for the dismissal of the Persistent Felony Offender designation at the change of plea hearing. *See e.g.,* (Doc. 64-1 at 1, 5, 11, 16, 25, 30, 36, 57, 62, 73, 86, 91, 96, and 107).

*Id.* The net maximum custodial sentence for Rose under this proposal would have been 25 years at the Montana State Prison.[2]  The offer stated it would expire at 4:30 p.m. on Friday, May 23, 2003. *Id.* at 2.

Because Sather believed Corn's proposal to be illegal in light of the fact that it called for the Persistent Felony Offender designation to result in a separate sentence rather than replacing the Assault with a Weapon charge,[3] she approached Corn on May 22, 2003 with the intent of making a counter offer. (Doc. 8-81 at 1). The meeting and communication between the parties quickly broke-down and, as a result, Corn withdrew his offer. *Id.* at 1-2; *see also* Doc. 57-1 at 7-9.  It does not appear that Sather attempted to reopen plea discussions prior to the expiration period set by Corn.  Nor did she seek intervention from the trial court after Corn withdrew the offer, but prior to its expiration.  Importantly, it is undisputed that Corn's offer was never conveyed to Rose prior to the withdrawal/expiration of the offer.  Sather believed she may have discussed it with Rose at some point prior to

_____

[2] The manner in which Corn fashioned this proposal left a best case scenario under which Rose would receive a custodial sentence of five years on the persistent felony offender designation with the remaining five years suspended, and fully suspended sentences for the remaining charges.  Thus, with credit for time served, under this best case scenario, Rose would already have been parole eligible at the time Corn's offer was made. (Doc. 8-82 at 1).  Alternatively, under the worst case scenario, if Rose were to receive the maximum custodial sentence of 20 years for Assault with a Weapon and a consecutive five year custodial sentence for the Persistent Felony Offender Designation under Corn's capped recommendation, the result would have been a 25 year prison sentence with Rose parole eligible after 6.25 years. *Id.* at 2.

[3] This Court has previously described the illegality of Corn's offer as a matter of form, not of substance. *See,* (doc. 27 at 37).  That is to say, while the structure of Corn's proposal may have been problematic, the length of the sentence was legal, reasonable, and favorable to Rose.

the start of his jury trial. (Doc. 57-3 at 13). Rose maintains he did not learn of Corn's May 21, 2003, offer until nearly one year later. (Doc. 57-2 at 7).

At trial, Rose was convicted of all three felonies. At the sentencing hearing, the State made a recommendation that Rose receive a net sentence of 80 years with 30 years suspended, resulting in a custodial sentence of 50 years. (Doc. 8-58; Tr. 47:6-14). While the State did not recommend a separate sentence for the Persistent Felony Offender Designation, it noted that was one factor that played into the overall recommendation. *Id.* The State also acknowledged that under its recommendation, Rose would be parole eligible after serving 12.5 years in prison, but that he would essentially be under supervision for the remainder of his life. *Id.* at 48:18-20.

The Court imposed sentence as follows: for the Aggravated Kidnapping, Rose was committed to the Montana State Prison for 50 years, with 20 years suspended; for the offense with Assault with a Weapon, Rose was sentenced to 20 years consecutive to the Kidnapping; for Assault on a Peace Officer, Rose was committed to prison for 10 years to also run consecutively. (Doc. 8-58; Tr. at 65-66). The net result being an 80 years prison sentence with 20 of those years suspended. In addition, for the Persistent Felony Offender Designation, the Court imposed a sentence of 20 years consecutive to the underlying convictions. *Id.* The

net result being that Rose received a 100 year sentence: 80 years in custody with 20 years probation. *Id.*

### b. Analysis

A claim of ineffective assistance of counsel requires petitioner to show both that his counsel's performances was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* If there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper,* 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United Sates*, 531 U.S. 198, 203-04 (2001).

In its ruling on Rose's post-conviction petition, the trial court held that Sather did not act unreasonably when she failed to convey a plea offer to him which she believed to contain an illegal recommendation. (Doc. 8-79 at 68). The trial court also noted its belief, based upon Rose's actions throughout the proceedings, that Rose would not have accepted the plea offer had it been conveyed to him and that during trial Rose did not exhibit remorse. *Id.* at 65-68. This finding was not based on testimony obtained from either Rose or Sather in

post-conviction proceedings. The trial court held that Rose failed to establish under the first prong of *Strickland* that Sather's performance was deficient, thus the claim was dismissed. *Id.* This Court previously found that the trial court's failure to take testimony on this point was unreasonable. (Doc. 27 at 35-36).

The Montana Supreme Court analyzed Rose's claim under the second prejudice prong of *Strickland* holding that Rose could not prove prejudice because the plea offer advanced was illegal. *Rose v. State*, 304 P. 3d 398, 392, ¶23 (Mont. 2013). However, this Court previously held that decision resulted from an unreasonable determination of the facts of the case. (Doc. 27 at 36). The offer conveyed by Corn was just that, an offer. There was nothing in the record to indicate what actually happened during the negotiation process and what steps, if any, Sather took to attempt to rectify Corn's withdrawal of the offer. And this Court found that the Montana Supreme Court unreasonably applied the prejudice prong of *Strickland* to Rose's case. That is, the Court should have determined whether there was a reasonable probability that Rose would have pled guilty rather than proceeding to trial, if not for counsel's deficient performance. *Id.* at 37. Where the analysis on federal habeas results in the conclusion that 28 U.S.C. § 2254(d)(1) is satisfied, federal habeas courts must review the substantive constitutionality of the state custody de novo. *Frantz v. Hazey*, 533 F.3d 724, 737

(9th Cir. 2008).

### i. Deficient performance

The State argues that Sather's rationale for not presenting the offer to Rose is justified and, therefore, not deficient performance. The Court is not persuaded by this position. Sather's affidavit, her deposition testimony, and Corn's deposition testimony, leads this Court to believe that the failure to present the offer did, in fact, constitutes deficient performance. "As a general rule, defense counsel has a duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012); *see also United States v. Blaylock*, 20 F. 3d 1458, 1466 (9th Cir. 1994) ("[A]n attorney's failure to communicate the government's plea offer to [her] client constitutes unreasonable conduct under the prevailing professional standards.").

While the State commends Sather for researching the legality of the persistent felony offender sentence on the proffered plea, this does not justify Sather's failure to convey the offer to Rose, explaining her concerns about its legality, and exploring any push back by Corn. In its briefing, the State acknowledges that during Corn's deposition, he testified that if changing the semantics of the agreement would have been all that was necessary to reach a plea,

8

he would have been willing to do so. (Doc. 56 at 19; *see also,* Doc. 57-1 at 29, 38, 43-44). Sather also testified that the issue with the plea agreement "seemed like something we could have worked out." (Doc. 57-3 at 52).

Because the original offer was never communicated to Rose prior to its withdrawal/expiration, any chance of Rose having the offer modified with respect to the persistent felony designation was lost. By making a counter-offer without appraising Rose of the terms of the original May 21, 2003 offer and risking withdrawal of the offer, it cannot be said that Sather rendered the effective assistance required by the Constitution. *See, Frye,* 132 S. Ct. at 1408.

### ii.    Prejudice

In view of Sather's deficient performance, the crux of this claim turns on the prejudice analysis. Rose unequivocally maintains that he would have accepted the offer had it been presented to him. (Doc. 57-2 at 31, 41). The State counters that, with the benefit of hindsight, of course Rose asserts now that he would have accepted the offer.

In order to demonstrate prejudice where a plea offer has lapsed or been rejected due to deficient performance, Rose must show a reasonable probability (1) that he would have accepted the earlier plea offer, and (2) that the plea would have been entered without the prosecution canceling it or the trial court refusing to

accept it. *Frye*, 132 S. Ct. at 1409. *Frye* also instructs prejudice can be shown by: "a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Id.*

### 1. Rose's Acceptance of the Offer

What *Frye* precisely requires for a petitioner to demonstrate prejudice is not exactly clear under current decisional law. *See, Merzbacher v. Shearin*, 706 F. 3d 356, 366 (4th Cir. 2013). The view adopted by the Sixth Circuit is that the petitioner's own credible testimony that he would have accepted the plea offer coupled with the disparity between the sentence offered and the one actually received establishes the requisite reasonable probability that the petitioner would have accepted the plea offer. *See, e.g., Smith v. United States*, 348 F. 3d 545, 551-52 (6th Cir. 2003). The Seventh Circuit, in contrast, requires the petitioner to present objective evidence that establishes a reasonable probability of acceptance. *See, e.g., Toro v. Fairman*, 940 F. 2d 1065, 1068 (7th Cir. 1991). Absent a controlling decision by the Supreme Court or the Ninth Circuit, the Court finds the Sixth Circuits' rationale persuasive.

As set forth above, it is undisputed that there was a significant disparity between the plea offered by Corn in May of 2003 and the sentence which Rose

10

ultimately received. In support of his position that he would have accepted the agreement, Rose points out that he insisted upon a settlement conference between his first attorney, Larry Mansch, and Corn; he informed the trial court he wanted time to consider the initial offer Corn made him; and, he did not overtly reject that initial offer. (Doc. 57-2 at 16-17, 36). Also, Rose testified that he asked Sather to look into a potential plea resolution. *Id.* at 21, 37. Sather indicated that she and Rose did discuss the potential of a plea resolution. (Doc. 57-3 at 32, 34, 39, 64). The fact that Rose would have avoided two felonies, and particularly that he would have avoided the aggravated kidnapping charge with which he was most concerned, gives further credence to Rose's position. (Doc. 57-2 at 33). Additionally, it is undisputed that the May 21, 2003 offer was very favorable to Rose.

Rose has shown a reasonable probability he would have accepted the earlier plea offer had he been afforded effective assistance. *See, Frye*, 132 S. Ct. at 1409; *Smith*, 348 F. 3d at 551-52 (6th Cir. 2003).

## 2. State's Adherence /Trial Court's Acceptance of the Offer

Further, there is ample reason to believe that Corn would have honored the May 21, 2003 offer. Although Corn testified that the offer called for less time than he believed Rose deserved, it would have resolved the case and spared the victim

11

from going through trial. (Doc. 57-1 at 32-33). As the County Attorney, Corn was certainly familiar with what sentences were within the range of acceptability to the trial court. Further, Corn testified that he had a victim who was anxious to get the case resolved and who had been adversely affected by the multiple delays of the trial. (Doc. 57-1at 32-33, 40-41, 43). Rose has established a reasonable probability that Corn would have abided by the terms of the agreement. *Frye*, 132 S. Ct. at 1409

The determinative inquiry reduces to whether or not the trial court would have accepted the agreement. The State maintains that even if the trial court had been sentencing Rose to one felony per the lapsed plea agreement, rather than the three he was convicted of following trial, the court would have had all of the same information before it and Rose's criminal history would have been the same. The State references remarks the trial court made during Rose's sentencing relating to his crimes, his criminal history, and his methamphetamine addiction all of which weighed into factoring the sentence. (Doc. 63 at 10). The State also notes that when Rose was sentenced, the trial court had and reviewed Rose's psychological evaluation, as well as his old and updated presentence investigation reports. *Id.* Thus, given the trial court's concerns about the danger Rose posed to the community, the State contends it was likely the trial court would have imposed the

same sentence regardless, and, therefore, Rose cannot meet his burden under the prejudice prong. The State stresses that regardless of whether he was convicted of one felony or three, Rose was still a persistent felony offender.

Certainly, the trial court would have been aware of Rose's criminal history had he been sentenced before proceeding to trial. But, there is also reason to believe that the trial court, viewing the parties to be in the best position to appreciate the nuances of their own case and consequently having the best understanding of what would constitute an appropriate resolution, would have honored a plea agreement were one presented. Rose has compiled documents from 22 separate Ravalli County cases prosecuted during the same time period as Rose's case wherein the trial court honored plea agreements entered into by the parties. *See generally*, (Doc. 64-1). Additionally, had Rose accepted the plea agreement prior to trial, significant judicial resources and energy would have been saved. "The guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned." *Blackledge v. Allison*, 431 U.S. 63, 71 (1977). Rose has demonstrated a reasonable probability that the plea agreement would have been entered without the trial court refusing to accept it. *Frye*, 132 S. Ct. at 1409.

### iii. Remedy

In a situation such as Rose's, *Lafler* instructs as to the appropriate remedy to resolve the constitutional violation. The prosecution is to reoffer the proposed plea and at a hearing the trial judge may "exercise discretion in deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed." *Lafler*, 132 S. Ct. at 1376.

While the *Lafler* Court did not set exact parameters on what a trial court is to consider in this situation, it noted that the trial court may take account of a defendant's willingness or unwillingness to accept responsibility for his actions. *Id.* The Court also observed that while the trial court is not expected to disregard any information concerning the crime that was discovered following the plea offer, the position occupied by both the defendant and prosecution prior to the making of the offer should be considered as a "baseline" by a trial court when fashioning an appropriate remedy. *Id.*

It is recommended that Rose's petition be granted as to Claim 2 for the limited purpose of sending Rose's case back to the state trial court to allow the prosecution to offer the equivalent terms of the agreement proposed by Corn on May 21, 2003, and for the trial court to make a determination consistent with *Lafler* as outlined above.

## II.    Claim 6- Speedy Trial

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial…" In analyzing whether or not a violation of one's speedy trial right has occurred, the court must consider four factors: (1) the length of the pretrial delay; (2) whether the government or the defendant is more to blame for the delay; (3) whether the defendant asserted his right to a speedy trial; (4) whether the defendant was prejudiced as a result of the delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). The Court has refused to quantify the speedy trial right into a given number of days, but instead established the *Barker* balancing test "in which the conduct of both the prosecution and the defendant are weighed." *Id*. at 529.

The Montana Supreme Court's factual findings in relation to Factors 1, 3, and 4 have survived this Court's intrinsic review and are presumed to be correct. See, *Taylor v. Maddox*, 366 F. 3d 992, 999, 1000 (9th Cir. 2004); 28 U.S.C. § 2254 (e)(1).    Under Factor 1, there was sufficient pretrial delay to trigger further speedy trial analysis. Under Factor 3, this Court agrees that although he asserted his right to a speedy trial, Rose's actions were seemingly inconsistent with someone seeking to be brought to trial in a speedy manner. Under Factor 4, given the serious nature of Rose's crimes, the length of his incarceration was not

15

oppressive and the mental and physical problems were not exacerbated unjustly by the incarceration. Additionally, there was nothing to demonstrate that the preparation of his defense was impaired by his incarceration.

The same presumption of correctness, however, did not attach to Factor 2. As explained in the previous Finding and Recommendation of this Court, the Montana Supreme Court's analysis of Rose's speedy trial claim as it pertained to the second *Barker* factor contained a "misattribution of delay" and a silent record "on the reason for some of lengthy periods of delay." (Doc. 27 at 41). Accordingly, limited discovery relevant to this factor was allowed to develop evidence, whether favorable to Rose or the State, to clarify where and why there were gaps in the record. *See*, (Doc. 39 at 3). Thus, it was incumbent upon the parties to further develop, either via discovery or during the evidentiary hearing, where the long periods of delay were to be properly attributed.

### Factor 2- Responsibility for the Delay

*Barker* informs that different weights are to be given for different reasons for delay. *Barker*, 407 U.S. at 531. Deliberate delay aimed at "hamper[ing] the defense" weighs heavily against the prosecution, while "more neutral reason[s] such as negligence and overcrowded courts" weigh less heavily but are still to be considered. *Id*. While it is undisputed that institutional delay occurred, Rose's

own actions served as the impetus of the delay from the first trial setting in July of 2002 until the trial was re-set for a third time in February of 2003.

Rose was taken into custody on January 10, 2002, and his trial was originally set for July 29, 2002, 200 days following his arrest. During the evidentiary hearing, Rose conceded that there was nothing unreasonable about the length of time involved in the original trial setting. This time period is to be considered institutional delay and it does not weigh heavily against the State. *Barker,* at 531.

Prior to his first trial, Rose had raised multiple concerns with Larry Mansch, his trial counsel. At a hearing held on June 19, 2002, Rose requested that new counsel be appointed. In response to this request, the trial court advised Rose that appointing him new counsel could result in the trial being delayed "several more weeks or even months." (Doc. 8-12 at 2). Ultimately, the court appointed a new attorney who then held the conflict public defender contract, Dusty Gahagan. *Id.* Mr. Gahagan happened to be in the courtroom during this proceeding, the court advised Gahagan to let it know once he had reviewed Mr. Rose's file whether or not the July 29, 2002, trial date would need to be extended. *Id.* at 3. During the proceeding, the State twice expressed its concern about running into a speedy trial issue. *Id.* at 1 and 3.

On July 11, 2002, Gahagan filed a motion to continue the July 29, 2002, trial setting. (Doc. 8-13). As a basis for this motion, Gahagan explained that he needed more time to review Rose's file and prepare his defense. *Id.* Attached to this motion was a handwritten waiver of speedy trial. *Id.* at 3. Gahagan also advised the court that he no longer held the "conflict public defender contract" and that he had been in contact with the newly hired attorneys about potentially assuming representation of Mr. Rose. *Id.* at 1. On July 12, 2002, Rose wrote a letter to the Court, inquiring as to whether or not his trial date had been continued, and expressing his desire to have the trial date postponed in order to ensure that he received a fair trial. (Doc. 8-14 at 1).

On July 19, 2002, Gahagan filed a motion to substitute Kelli Sather, one of the new conflict public defenders, as Rose's attorney. (Doc. 8-15). The motion was granted on July 22, 2002. (Doc. 8-16). The jury trial was subsequently rescheduled to November 18, 2002. (Doc. 8-17).

There was insinuation made at the January 13, 2016, evidentiary hearing before this Court that Gahagan accepted the appointment already knowing that he would not be holding the conflict public defender contract. While it is true that the State may be responsible for delay for speedy trial purposes if there is "a breakdown in the public defender system," *Vermont v. Brillon*, 129 S. Ct. 1283,

1287 (2009), the evidentiary hearing did not establish that there was an institutional problem or breakdown. Given that the trial was continued based upon Rose's request for new counsel, and that Rose understood that, in all likelihood appointment of new counsel would delay his trial, this time period between the first and second trial setting is attributable to Rose.

On October 22, 2002, Rose wrote a letter to the trial court requesting that he be able to represent himself. (Doc. 8-18). On October, 25, 2002, Sather filed a motion for a psychological evaluation and requested that a hearing be held to address the motion. (Doc. 8-19). On October 28, 2002, the trial court held a hearing to address both of these issues. *See generally*, (Doc. 8-22).

At the hearing in this matter, Rose maintained he had not met with Sather and certainly had not discussed the potential for a psychological evaluation with her. But Rose's testimony on this point was simply not credible. Moreover, the transcript of the trial court's hearing on this matter belies Rose's assertions. It appears that Rose not only desired to undergo a mental health evaluation from the beginning of his case, but also he had expressed as much to his first attorney, Mansch. *Id*. at 3. Ultimately the trial court did grant the motion for the psychological evaluation and advised Rose that his trial date would have to be continued as a result and that unless Rose posted bond, he would remain in custody

for a few more months. *Id.* at 4. Rose indicated that he understood. *Id.* Additionally, because there was an issue raised about Rose's fitness to proceed, the court elected not to set a trial date or rule on Rose's motion to represent himself until the evaluation was complete. *Id.* at 4-5. The State again raised concerns over moving the trial date. *Id.* at 2-3.

Sather retained Dr. Davis to perform the psychological evaluation. Based upon his report, it appears that Davis began the evaluation on November 2, 2002 and completed his report on January 22, 2003. (Doc. 58 at 29). At the hearing before this Court, neither party could state with certainty when Sather received Davis' report. Based upon further review of the record, it appears Sather received the report sometime during the first week of February of 2003. (Doc. 8-24 at 1).

At the hearing in this matter, the State was able to provide some insight as to why the evaluation took nearly three months. Ms. Sather testified that the evaluation process can often be a time consuming one. In Mr. Rose's case, the evaluator, Dr. Davis, had to execute releases from Mr. Rose in order to obtain past medical records. Dr. Davis then had to gather those records and compile the testing to be performed with Rose. Dr. Davis met with Mr. Rose on more than one occasion at the Ravalli County Detention Facility to perform the psychological testing. Dr. Davis then prepared a report which Sather found to be very through

and helpful to Rose's defense. Accordingly, this time was properly attributed to Rose.

On January 30, 2003, Rose sent a letter to the trial court raising concerns about his due process rights. (Doc. 8-23). On February 12, 2003, the court held a hearing to address both Rose's concerns and the status of the evaluation. *See generally*, (Doc. 8-24). Sather informed the court that Davis found Rose competent to proceed to trial. *Id.* at 1. She also informed the court that she and Rose had met and reviewed the report but needed additional time to determine whether they would rely on the defense of mental disease/defect at trial. *Id.* at 2. The state expressed concern with the prior delays and asked the court to set a trial date. *Id.* On February 14, 2003, Sather filed notice of Rose's intent to introduce evidence of mental disease or defect. (Doc. 8-68 at 7). On February 18, 2003, a trial date of May 12, 2003 was set. (Doc. 8-25).

Rose admitted in his testimony in this matter that he was in favor of getting evaluated. The record is clear that the trial court informed Rose that this process would delay his trial date. Based upon the fact that Rose requested the evaluation and that his competency was at issue, it was not unreasonable for the trial court to hold off on setting a new trial date until the evaluation was complete. Had Rose been found incompetent, as the trial court observed, the parties would have been

"on a different track" and a trial date wouldn't be necessary. *See*, (Doc. 8-22 at 5). The period of time from the second trial setting in November of 2002 to the hearing regarding the evaluation held on February 12, 2003, should be attributed to Rose. There was no evidence presented at the hearing before this Court to demonstrate the time should be attributed otherwise.

It appears that a May trial setting was the earliest available to the trial court. The record here and the testimony presented at the evidentiary hearing suggest that in 2002 and 2003 the Ravalli County trial docket was a very busy one. Thus, the 89 days from the February 12, 2003 order to the May 12, 2003 trial date was not unreasonable. This time is attributed to the state as institutional delay and is not heavily weighted. *Barker,* at 531. Apparently, due to a conflict within the trial court's own calendar the May trial date was reset for June 2, 2003. (Doc. 8-68 at 8, ¶ 30). The rescheduled trial date resulted in an additional 3-week institutional delay and still is not to be weighted heavily against the State.

Furthermore, it is undisputed from the record and the testimony presented before this court that the prosecution diligently attempted to prosecute Rose. Not once did the State move for a continuance, but rather objected to each one made by Rose and repeatedly cited concerns relating to a potential speedy trial issue. In fact, the State went so far as to express its view that Rose was intentionally trying

to derail his first and second trial settings. (Doc. 8-22 at 2). It is true that Mansch was removed as Rose's attorney and the first trial was delayed. A defendant's deliberate attempts to disrupt proceedings are to be weighted heavily against the defendant. See, *Brillon*, 129 S.Ct. at 292 (but for Brillon's attempts to force the withdrawal of two of his attorney's, no speedy trial issue would have arisen).

Based upon the record and testimony presented at the evidentiary hearing, Rose did not present any new information that would lead this Court to conclude that any length of time between the first trial setting in July of 2002 and the February 12, 2003, hearing should be attributed to the State. The time that is to be attributed to the State is all institutional in nature. In balancing this determination along with the other three *Barker* factors, it has not been established that Rose was denied his right to a speedy trial.

## RECOMMENDATION

1. In relation to Claim 2, Rose's petition should be **CONDITIONALLY GRANTED**. On or before **June 10, 2016**, the State may offer the equivalent terms of the plea agreement proposed on May 21, 2003. The state trial court may then make a determination of whether or not to vacate the conviction from trial and accept the plea or leave the conviction undisturbed. If the State does not meet the deadline for reoffering the plea agreement, Rose should be released from custody.

2. Rose's Claim 6 should be **DENIED** for lack of merit.

**NOTICE OF RIGHT TO OBJECT
TO FINDINGS & RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT**

Rose may object to this Findings and Recommendation within 14 days.[4] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Rose must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of his case without notice to him.

DATED this 5th day of May, 2016.

Jeremiah C. Lynch
United States Magistrate Judge

---

[4] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.

24